**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 08-CR-1324-LRR |
| vs. | |
| AGRIPROCESSORS, INC., SHOLOM RUBASHKIN, BRENT BEEBE, HOSAM AMARA and ZEEV LEVI, | **ORDER** |
| Defendants. | |

_____

### *TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *RELEVANT PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . *2*
     *A.*      *Seventh Superseding Indictment* . . . . . . . . . . . . . . . . . . . . . . *2*
     *B.*      *Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*

*III.*   *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
     *A.*      *Rule 12* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
     *B.*      *Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*

*IV.*   *FACTUAL ALLEGATIONS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
     *A.*      *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
     *B.*      *Secretary's Order* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*

*V.*    *SUMMARY OF ARGUMENT* . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*
     *A.*      *Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*
         *1.*      *Fifth Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . . *12*
         *2.*      *Eighth Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . *13*
     *B.*      *Resistance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*
         *1.*      *Fifth Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . . *13*
         *2.*      *Eighth Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . *15*
     *C.*      *Reply* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *16*
         *1.*      *Fifth Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . . *16*
         *2.*      *Eighth Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . *16*
     *D.*      *Surreply* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*

VI.   OVERVIEW OF THE PACKERS' ACT . . . . . . . . . . . . . . . . . . . . . . . 17
      A.    Context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      B.    Nuts & Bolts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VII.  FIFTH AMENDMENT ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . 24
      A.    Facial Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      B.    As Applied Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
            1.    Fair notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
            2.    Susceptibility to arbitrary enforcement . . . . . . . . . . . . . . 29
      C.    Defense of Desuetude . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
      D.    Arbitrary Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VIII. EIGHTH AMENDMENT ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . 34

IX.   DISPOSITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## I.  INTRODUCTION

The matter before the court is Defendant Sholom Rubashkin's "Motion to Dismiss" ("Motion") (docket no. 439).[1]

## II.  RELEVANT PRIOR PROCEEDINGS

### A.  Seventh Superseding Indictment

On July 16, 2009, the grand jury returned the Seventh Superseding Indictment

---

[1] On March 31, 2009, the grand jury returned the Fifth Superseding Indictment (docket no. 413).  On April 21, 2009, Defendant Rubashkin filed the Motion.  On May 14, 2009, the grand jury returned the Sixth Superseding Indictment (docket no. 464).  Counts 123 through 142 of the Sixth Superseding Indictment are identical to Counts 60 through 79 of the Fifth Superseding Indictment.  On June 1, 2009, Defendant Rubashkin filed a "Motion to Dismiss Counts 123 Through 142" (docket no. 495) to reassert the arguments in the Motion against the Sixth Superseding Indictment.  On July 16, 2009, the grand jury returned the Seventh Superseding Indictment (docket no. 544).  Counts 123 through 142 of the Sixth Superseding Indictment are identical to Counts 144 through 163 of the Seventh Superseding Indictment.  Accordingly, the court deems the parties' various arguments with respect to the Fifth and Sixth Superseding Indictments to apply with equal force to the Seventh Superseding Indictment.

(docket no. 544)[2] against Defendants Agriprocessors, Inc. ("Agriprocessors"), Sholom Rubashkin, Brent Beebe, Hosam Amara and Zeev Levi. The Seventh Superseding Indictment contains 163 counts and a forfeiture allegation. Only Counts 144 through 163 are relevant to the Motion.

Counts 144 through 163 charge Defendants Rubashkin and Agriprocessors with Willful Violations of an Order of the Secretary of Agriculture and Aiding and Abetting Willful Violations of an Order of the Secretary of Agriculture, in violation of 7 U.S.C. § 195 and 18 U.S.C. § 2. The grand jury alleges that, on March 7, 2002, the United States Secretary of Agriculture ordered Defendant Agriprocessors "and its agents and employees to cease and desist from" failing to pay in a timely manner for livestock purchases and "failing to deposit checks issued in payment for livestock in the mail before the close of the next business day after the purchase of such livestock as required by law." Seventh Superseding Indictment at 53-54. The grand jury alleges that, "[b]eginning no later than about February 2008 and continuing through about April 2008," Defendants Agriprocessors and Rubashkin "willfully violated" the Secretary's Order and "aid[ed] and abett[ed violations]" of the Order. *Id.* at 53-54. Specifically:

Count 144 charges that Defendants Agriprocessors and Rubashkin deposited a check in the amount of $38,207.54 in the mail to "Waukon, Iowa, Cattle Supplier" on February 8, 2008 when livestock was purchased on February 4, 2008, and payment was due on February 5, 2008.

Count 145 charges that Defendants Agriprocessors and Rubashkin dated a check "February 15, 2008," in the amount of $96,497.88 to "Chicago Cattle Supplier" when

---

[2] The number of superseding indictments in this case is unusual but not unprecedented. The phrase "seventh superseding indictment" or "seventh superceding indictment" appears only twenty-one times in the reported federal cases. Some are quite famous. *See, e.g.*, *United States v. Bin Laden*, 126 F. Supp. 2d 290 (S.D.N.Y. 2001); *United States v. Gambino*, 828 F. Supp. 191 (S.D.N.Y. 1993).

livestock was purchased on February 11, 2008, and payment was due on February 12, 2008.

Count 146 charges that Defendants Agriprocessors and Rubashkin dated a check "February 25, 2008," in the amount of $47,219.00 to "Marshalltown, Iowa, Cattle Supplier" when livestock was purchased on February 13, 2008, and payment was due on February 14, 2008.

Count 147 charges that Defendants Agriprocessors and Rubashkin dated a check "February 25, 2008," in the amount of $91,698.55 to "Minnesota Cattle Supplier" when livestock was purchased on February 14, 2008, and payment was due on February 15, 2008.

Count 148 charges that Defendants Agriprocessors and Rubashkin deposited a check in the amount of $99,435.10 in the mail to "Waukon, Iowa, Cattle Supplier" on February 19, 2008 when livestock was purchased on February 4, 2008, and payment was due on February 15, 2008.

Count 149 charges that Defendants Agriprocessors and Rubashkin dated a check "February 19, 2008," in the amount of $90,076.74 to "Walnut, Illinois, Cattle Supplier" when livestock was purchased on February 14, 2008, and payment was due on February 15, 2008.

Count 150 charges that Defendants Agriprocessors and Rubashkin deposited a check in the amount of $71,465.27 in the mail to "Waukon, Iowa, Cattle Supplier" on February 26, 2008 when livestock was purchased on February 21, 2008, and payment was due on February 22, 2008.

Count 151 charges Defendants Agriprocessors and Rubashkin deposited a check in the amount of $76,937.72 in the mail to "Waukon, Iowa, Cattle Supplier" on March 4, 2008 when livestock was purchased on February 27, 2008, and payment was due on February 28, 2008.

Count 152 charges Defendants Agriprocessors and Rubashkin deposited a check in the amount of $88,698.48 in the mail to "Waukon, Iowa, Cattle Supplier" on March 4, 2008 when livestock was purchased on February 28, 2008, and payment was due on February 29, 2008.

Count 153 charges Defendants Agriprocessors and Rubashkin dated a check "March 7, 2008," in the amount of $47,938.32 to "Aplington, Iowa, Cattle Supplier" when livestock was purchased on March 4, 2008, and payment was due on March 5, 2008.

Count 154 charges Defendants Agriprocessors and Rubashkin dated a check "March 7, 2008," in the amount of $49,627.02 to "Ledyard, Iowa, Cattle Supplier" when livestock was purchased on March 4, 2008, and payment was due on March 5, 2008.

Count 155 charges Defendants Agriprocessors and Rubashkin dated a check "March 7, 2008," in the amount of $14,113.50 to "Ames, Iowa, Cattle Supplier" when livestock was purchased on March 4, 2008, and payment was due on March 5, 2008.

Count 156 charges Defendants Agriprocessors and Rubashkin dated a check "March 7, 2008," in the amount of $189,987.73 to "Waverly, Iowa, Cattle Supplier" when livestock was purchased on March 4, 2008, and payment was due on March 5, 2008.

Count 157 charges Defendants Agriprocessors and Rubashkin hand delivered a check in the amount of $93,680.45 on March 25, 2008 to "Waukon, Iowa, Cattle Supplier" when livestock was purchased on March 20, 2008, and payment was due on March 21, 2008.

Count 158 charges Defendants Agriprocessors and Rubashkin hand delivered a check in the amount of $149,214.77 on April 2, 2008 to "Waukon, Iowa, Cattle Supplier" when livestock was purchased on March 27, 2008, and payment was due on March 28, 2008.

Count 159 charges Defendants Agriprocessors and Rubashkin dated a check "April 2, 2008," in the amount of $7,371.60 to "Aplington, Iowa, Cattle Supplier" when

livestock was purchased on March 28, 2008, and payment was due on March 29, 2008.

Count 160 charges Defendants Agriprocessors and Rubashkin hand delivered a check in the amount of $43,871.28 on April 5, 2008 to "Waukon, Iowa, Cattle Supplier" when livestock was purchased on March 31, 2008, and payment was due on April 1, 2008.

Count 161 charges Defendants Agriprocessors and Rubashkin hand delivered a check in the amount of $77,170.06 on April 9, 2008 to "Waukon, Iowa, Cattle Supplier" when livestock was purchased on April 3, 2008, and payment was due on April 4, 2008.

Count 162 charges Defendants Agriprocessors and Rubashkin hand delivered a check in the amount of $112,657.10 on April 11, 2008 to "Waverly Iowa Cattle Supplier" when livestock was purchased on April 8, 2008, and payment was due on April 9, 2008.

Count 163 charges Defendants Agriprocessors and Rubashkin expressed a check via UPS in the amount of $48,727.51 on April 21, 2008 to "Waverly, Iowa, Cattle Supplier" when livestock was purchased on April 15, 2008, and payment was due on April 16, 2008.

On conviction of any one of the foregoing counts, Defendants Agriprocessors and Rubashkin face a fine of "not less than $500 nor more than $10,000" and a term of imprisonment of "not less than six months nor more than five years." 7 U.S.C. § 195(3). If convicted of all twenty counts, then, Defendants Agriprocessors and Rubashkin each face a combined statutory maximum of a $200,000 fine and 100 years of imprisonment.[3]

---

[3] The advisory Sentencing Guidelines range is typically at the low end of the statutory range. Absent a cross-reference for fraud or other crimes, the base offense level for a violation of § 195 is **6**. USSG §2N2.1(a) (emphasis in original); *id.* App'x A. The Guidelines may recommend higher sentences if an examination of the defendant's relevant conduct shows the offense involved fraud or was committed in furtherance of, or to conceal, other crimes. *See id.* § 2N2.1(c) (cross reference). Of course, the Guidelines are only advisory in this post-*Booker* world. *See United States v. Feemster*, No. 06-2059, 2009 WL 2003970, *7 (en banc) ("[S]ubstantive appellate review in sentencing cases is narrow and deferential. . . . [I]t will be the unusual case when we reverse a district court (continued...)

## B. Motion

On April 21, 2009, Defendant Rubashkin filed the Motion. On May 1, 2009, the government filed a Resistance (docket no. 451) to the Motion. On May 8, 2009, Defendant Rubashkin filed a Reply (docket no. 453). On May 21, 2009, with leave of court, the government filed a Surreply (docket no. 479). On June 3, 2009, Defendant Agriprocessors filed a Joinder (docket no. 498) to the Motion.

On June 4, 2009, the court held a hearing on the Motion. Assistant United States Attorneys C.J. Williams and Peter E. Deegan, Jr., represented the government. Attorneys F. Montgomery Brown and Adam Zenor represented Defendant Rubashkin, who was personally present. Attorney Meghan Sloma appeared telephonically on behalf of Defendant Agriprocessors. The Motion is fully submitted and ready for decision.

## III. PRINCIPLES OF REVIEW

### A. Rule 12

In the Motion, Defendants Rubashkin and Agriprocessors ask the court to dismiss Counts 144 through 163 of the Indictment because, in their view, 7 U.S.C. § 195 is constitutionally infirm. Specifically, Defendants Rubashkin and Agriprocessors argue Counts 144 through 163 must be dismissed because § 195 violates two provisions of the United States Constitution: (1) the Due Process Clause of the Fifth Amendment and (2) the Cruel and Unusual Punishments Clause of the Eighth Amendment.

Defendants Rubashkin and Agriprocessors bring the Motion under Federal Rule of Criminal Procedure 12. In relevant part, Rule 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2). Motions "alleging a defect in the

---

[3](…continued)
sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable.") (quoting *United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008)).

indictment" must be brought prior to trial. Fed. R. Crim. P. 12(b)(3).

The government generally does not dispute that Rule 12 is an appropriate procedural mechanism for Defendants Rubashkin and Agriprocessors to lodge their arguments. However, the government denies that their Eighth Amendment arguments are ripe for review.

The court agrees with the parties that the arguments of Defendants Rubashkin and Agriprocessors may be decided without a trial of the general issue and thus fall within the ambit of Rule 12. *See, e.g.*, *United States v. Smith*, 964 F. Supp. 286, 294 (N.D. Iowa 1996) (Melloy, C.J.) (considering pretrial void-for-vagueness challenge to 18 U.S.C. § 921(a)(33)), *aff'd*, 171 F.3d 617, 622-23 (8th Cir. 1999). The court may decide the merits of the Motion without resolving the "general issue," *i.e.*, whether Defendants Rubashkin and Agriprocessors are innocent or guilty of Counts 144 through 163. *See United States v. Suescun*, 237 F.3d 1284, 1286 (11th Cir. 2001) (defining the "general issue" as "whether [the defendant] was guilty of the charged offenses"). The court considers the government's ripeness challenge to their Eighth Amendment argument in Part VIII *infra*.

### B.  Standard

When evaluating the merits of a Rule 12 motion to dismiss, the court must accept all of the government's allegations in the indictment as true. *See, e.g.*, *United States v. Sampson*, 371 U.S. 75, 78-79 (1962) ("Of course, none of these charges have been established by evidence, but at this stage of the proceedings the indictment must be tested by its sufficiency to charge an offense."); *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (similar). It must be remembered that there is no "federal criminal procedure . . . 'for a pre-trial determination of sufficiency of the evidence.'" *United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (quoting *United States v. Critzer*, 951 F.2d 306, 307-08 (11th Cir. 1992)). As this court stated long ago:

> A motion to dismiss the indictment is not a device for a summary trial of the evidence. The sole function of this motion is to test the sufficiency of the indictment to charge an offense. [*Sampson*, 371 U.S. at 83]. The sufficiency of the indictment must be determined from the words of the indictment, and the Court is not free to consider evidence not appearing on the face of the indictment. In ruling on this motion, all well-pleaded facts are taken to be true. *United States v. South Florida Asphalt Co.*, 329 F.2d 860 (5th Cir. 1964); *Padilla v. United States*, 278 F.2d 188 (5th Cir. 1960).

*United States v. Luros*, 243 F. Supp. 160, 165 (N.D. Iowa 1965) (Hanson, J.), *rev'd on other grounds*, 389 F.2d 200 (8th Cir. 1968). "'The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29[.]'" *Ferro*, 252 F.3d at 968 (quoting *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000)).

## IV. FACTUAL ALLEGATIONS

Assuming the truth of the factual allegations in the Seventh Superseding Indictment and affording the government all reasonable inferences, for purposes of the Motion the facts are these:

### A. Players

Defendant Rubashkin was a vice president of Defendant Agriprocessors, an Iowa corporation. Defendant Agriprocessors bought cattle and poultry for the purposes of slaughtering, processing and preparing meat for sale. Defendant Agriprocessors sold meat, both in the United States and abroad, under the trademarked names "Iowa Best Beef," "Shor Habor," "Aaron's Best" and "Rubashkin." Defendant Agriprocessors' primary meatpacking plant was located in Postville, Iowa, where it processed both beef and poultry products.

Defendant Rubashkin controlled the day-to-day operations of Defendant Agriprocessors, including its finances and the Postville plant. Although Defendant

Agriprocessors publicly named a new chief executive officer in September of 2008, Defendant Rubashkin continued to exercise day-to-day control over Defendant Agriprocessors' finances and the management of the Postville plant. Defendant Rubashkin is the son of Defendant Agriprocessors' owner, who lives in Brooklyn, New York.

### B.  Secretary's Order

On or about March 7, 2002, the United States Secretary of Agriculture ("Secretary") issued an Order to Agriprocessors, pursuant to the Packers and Stockyards Act of 1921, 7 U.S.C. § 181 *et seq.* ("Packers' Act").  In the Order, the Secretary directed Defendant Agriprocessors, its agents and employees to

> cease and desist from failing to pay, when due, the full purchase price of livestock as required by law, and failing to deposit checks issued in payment for livestock in the mail before the close of the next business day after the purchase of such livestock as required by law.

Seventh Superseding Indictment at 6.  Defendant Rubashkin consented to and signed the Order on behalf of Defendant Agriprocessors.[4]

On or about September 14, 2005, Defendant Agriprocessors and another entity, Local Pride, LLC ("Local Pride"), entered into a Second Amended and Restated Credit Agreement ("Agreement") (docket no. 451-3) with FB Commercial Finance, Inc.

---

[4] This allegation is not contained in the Seventh Superseding Indictment.  The government attached a copy of the Order to its Resistance as Government Exhibit 1 (docket no. 451-2).  Ordinarily the court would be hesitant to consider Government Exhibit 1, because it is not contained within the four corners of the charging document; in the case at bar, however, Defendants Rubashkin and Agriprocessors do not object to the court considering it.  *See, e.g.*, *United States v. Hall*, 20 F.3d 1084, 1087-88 (10th Cir. 1994) (holding district court may consider factual allegations not contained within the four corners of the indictment if the allegations are undisputed and neither party objects); *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988); *cf. United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) (reiterating the general rule that "the district court is bound by the four corners of the indictment").

Defendant Rubashkin signed the Agreement on behalf of Local Pride as its President. In the Agreement, Defendant Agriprocessors and Local Pride agreed to "comply with the Packers Act in all respects." Agreement at § 6.19. They specifically promised to "promptly pay all of its suppliers of Inventory." *Id.*[5]

On or about March 22, 2006, Defendant Rubashkin filed an Affidavit (docket no. 451-4) in the United States Bankruptcy Court for the Eastern District of New York on behalf of Defendant Agriprocessors as its Vice President. In the Affidavit, Defendant Rubashkin acknowledged his understanding of Defendant Agriprocessors' obligations under the Packers' Act to "pay for the cattle within 24 hours of their purchase and delivery." Affidavit at ¶ 23.[6]

Beginning no later than about February of 2008, and continuing through about April of 2008, Defendants Agriprocessors and Rubashkin "did willfully fail to obey, and did aid and abet the failure to obey," the Order. Seventh Superseding Indictment at 53. Defendants Agriprocessors and Rubashkin failed to pay the full purchase price for livestock when due. Defendants Agriprocessors and Rubashkin also failed to deposit checks issued in payment for livestock in the mail before the close of the next business day after the purchase of such livestock as required by law. The Seventh Superseding Indictment sets forth twenty separate occasions on which checks from Agriprocessors to various cattle suppliers were dated, postmarked, and/or hand-delivered after payment was due. These late checks ranged in value from $7,371.60 to $189,987.73, as detailed in Part

[5] The allegations in this paragraph are not contained in the Seventh Superseding Indictment. The government attached a copy of the Agreement to its Resistance as Government Exhibit 2 (docket no. 451-3). For the reasons expressed in footnote 4 *supra*, the court considers it.

[6] The allegations in this paragraph are not contained in the Seventh Superseding Indictment. The government attached a copy of the Affidavit to its Resistance as Government Exhibit 3 (docket no. 451-4). For the reasons expressed in footnote 4 *supra*, the court considers it.

II.A *supra*.

The government does not allege that Defendants Agriprocessors and Rubashkin never paid their cattle suppliers in full. The government only alleges that Defendants Agriprocessors and Rubashkin did not pay their suppliers in full in a timely manner.

## V. SUMMARY OF ARGUMENT

As indicated in Part III.A *supra*, Defendants Agriprocessors and Rubashkin ask the court to dismiss Counts 144 through 163 of the Seventh Superseding Indictment. They argue 7 U.S.C. § 195 violates the Due Process Clause of the Fifth Amendment and the Cruel and Unusual Punishments Clause of the Eighth Amendment. The government resists the Motion in all respects.

### A. Motion

#### 1. Fifth Amendment

Defendants Agriprocessors and Rubashkin characterize their Fifth Amendment argument as a "facial void for vagueness challenge to a criminal statute." Brief in Support of Motion (docket no. 439-2), at 4 (citing *City of Chi. v. Morales*, 527 U.S. 41 (1999)). Defendants Agriprocessors and Rubashkin argue § 195—on its face—violates the Due Process Clause because it is "[v]oid for [v]agueness." *Id.*

Defendants Agriprocessors and Rubashkin contend § 195 lacks fair notice and permits arbitrary enforcement. Defendants Agriprocessors and Rubashkin argue § 195 lacks fair notice because it "does not sufficiently define the criminal offense it purports to punish." *Id.* at 5. Defendants Rubashkin and Agriprocessors opine that (1) "the statute lacks any notice mechanism for employees to be put on notice that they may be subjected to serious criminal punishment," *id.*; (2) "assumes . . . that all agents have the . . . ability to conform their conduct to the Order," *id.* at 6; (3) "presumes 'any employee' has control over a particular payment made to a vendor under [the Packers' Act], *id.* at 6; (4) contemplates a cease-and-desist order that may "survive[] in perpetuity," *id.*, and (5) "fails

to provide fair notice because the culpable conduct is not *malum in se*[;] it is *malum prohibito* [sic], *id*. They posit hypothetical circumstances in which the application of § 195 might be vague. *See, e.g.*, *id.* at 5 ("[U]nder the ambit of the statute[,] even an employee who did not know he was violating an [o]rder from the [Secretary] may be punished."); *id.* at 6 ("To hold a buyer criminally responsible for an accountant's mistake—or a supervisor criminally accountable for an accountant's mistake—fails to comport with our most basic understanding of fairness, let alone culpability within criminal law jurisprudence."). Defendants Agriprocessors and Rubashkin argue § 195 permits arbitrary enforcement because "there is no mechanism within the statute to refer cases for . . . prosecution." *Id.* at 7. Therefore, the decision to prosecute is left to the whims of a prosecutor. Defendants Agriprocessors and Rubashkin stress that the government has never prosecuted anyone for a violation of § 195 in the 88 years since it was enacted, and, therefore, the prosecution in this case is arbitrary.

### 2.    Eighth Amendment

Defendants Agriprocessors and Rubashkin argue § 195 violates the Cruel and Unusual Punishments Clause because it is an impermissible "status" crime. *Id.* at 8 (discussing *Robinson v. California*, 370 U.S. 660 (1962)). Defendants Agriprocessors and Rubashkin point out that § 195 does not require the government to prove scienter—it requires proof of an *actus reus* but no *mens rea*. They also stress the penalty of § 195 is grossly disproportionate when compared to the prohibited conduct.

### B.  Resistance

### 1.    Fifth Amendment

The government argues Defendants Rubashkin and Agriprocessors misunderstand the nature of a void-for-vagueness challenge to a penal statute. The government points out that Defendants Agriprocessors and Rubashkin do not claim § 195 "cannot be constitutionally applied to [them;] [r]ather, [their] entire argument is premised upon a

claim that [§ 195] is 'facially' invalid because it cannot be constitutionally applied to all employees of [Defendant] Agriprocessors." Resistance at 11. The government asserts the proper question is not whether § 195 "is 'facially' invalid because it cannot be constitutionally applied to all employees of Agriprocessors," *id.*, but whether § 195 "is impermissibly vague in all its applications," *id.* at 13. The government points out Defendants Rubashkin and Agriprocessors have not undertaken to show that § 195 is impermissibly vague in *all* its applications and thus their "entire vagueness argument . . . misses the mark." *Id.* at 12. The government argues this argument would fail because

> where a person is in the business of processing meat for sale and is ordered to cease and desist from failing to pay for livestock in accordance with the Packers['] Act, [§] 195 makes explicitly clear that the person is subject to certain criminal penalties. Unlike most criminal statutes, [§] 195 only subjects someone to criminal penalties if there has already been an order issued by the government under specified provisions of the law . . . . For purposes of the instant analysis, at a minimum, the person who was subject to the order is on extraordinary notice as to what conduct is prohibited, and the criminal consequences which could result.

*Id.* at 14 (emphasis omitted).

The government further argues that, if Defendants Agriprocessors and Rubashkin raised an "as applied" void-for vagueness challenge to § 195,[7] § 195 is not void-for-vagueness as to Defendants Agriprocessors and Rubashkin. *Id.* at 14. The government stresses that the Seventh Superseding Indictment alleges Defendants Agriprocessors and Rubashkin "willfully" violated the Secretary's Order. Pointing to the Agreement and the Affidavit, the government concludes "there appears to be no real dispute that [Defendants

---

[7] Of course, it does not necessarily follow that, if § 195 is void-for-vagueness as to some of Defendant Agriprocessors' employees, then § 195 is void-for-vagueness as to Defendant Rubashkin.

Agriprocessors and Rubashkin were] well aware of the Packers['] Act and its provisions."
*Id.* at 15.  While the statute does not contain a scienter element and "the 'willful' finding by the grand jury may overstate the requite mental state for conviction, the finding is more than sufficient to indicate defendant's knowledge that his conduct was prohibited." *Id.* at 15 n.3.

## 2. *Eighth Amendment*

The government argues the court lacks subject matter jurisdiction to consider whether a potential sentence for either Defendant Agriprocessors or Defendant Rubashkin on a § 195 conviction would pass muster under the Cruel and Unusual Punishments Clause.  The government maintains any Eighth Amendment challenge to § 195 would only ripen were a jury to convict Defendants Agriprocessors and Rubashkin.  Because it is unknown whether a jury will convict Defendants Agriprocessors and Rubashkin—let alone whether the undersigned would permit Counts 144 through 163 to proceed to the jury— the government insists the Eighth Amendment claim of Defendants Agriprocessors and Rubashkin is not ripe for this court's review.

In the alternative, the government argues any facial challenge to § 195 under the Cruel and Unusual Punishments Clause must fail because Defendants Agriprocessors and Rubashkin cannot show "the statute could never be applied to anyone without violating the Eighth Amendment." *Id.* at 18.  "At bottom, a sentence of no more than 5 years and imposition of a fine would not be 'grossly disproportionate' to the offense as applied to one who was aware of the order, was responsible for compliance with the order, and violated the order." *Id.* at 19.  At the Hearing, the government stressed that "[c]attle suppliers should not be treated as banks" and the Packers' Act rightly affords cattle suppliers significant protection lest meatpackers pay a cattle supplier only when they want to do so or only when they want to buy more cattle from that particular supplier.

At the Hearing, the government argued that the instant case provides a compelling

case for criminal prosecution. In the government's view, this is not a case in which a meatpacker was occasionally late; the government alleges Defendant Agriprocessors was chronically late in paying its cattle suppliers at the behest of Defendant Rubashkin. In effect, Defendants Agriprocessors and Rubashkin created an "illegal float" on the backs of the cattle suppliers. The government contended the alleged crimes are "significant" and warrant a "severe penalty."

## C. Reply

### 1. Fifth Amendment

In reply, Defendants Agriprocessors and Rubashkin reiterate that § 195 is "vague in all applications" because it "fails to sufficiently define conduct so as to make the imposition of criminal responsibility fair." Reply at 1. Defendants Agriprocessors and Rubashkin point out that § 195 lacks a *mens rea* element and urges the court not to read such an element into the statute to save it from a Fifth Amendment challenge. Defendants Agriprocessors and Rubashkin claim this is "an obvious case of discriminatory enforcement," *id.* at 2 (emphasis in original), and point out the government did not challenge their assertion that the government has never charged anyone—let alone a corporate entity—with this crime in 88 years. *Id.* at 4.

In the alternative, Defendants Agriprocessors and Rubashkin ask the court to hold that § 195 is void-for-vagueness as applied to them. For the same reasons expressed in the Motion with respect to their facial void-for-vagueness challenge to § 195, Defendants argue § 195 lacks fair notice and permits arbitrary enforcement.

### 2. Eighth Amendment

Defendants reassert their argument that § 195 violates the Eighth Amendment. Defendants do not address the government's ripeness argument[8] but simply reiterate their

---

[8] Counsel for Defendant Rubashkin briefly addressed the argument at the Hearing
(continued...)

assertion that "[t]he facts at bar raise the inference of gross disportionally [sic]":

> Assuming . . . late payments were made to cattle sellers, the
> [g]overnment does not allege payments were not made, but
> rather that payments were "late" as defined by the [Packers'
> Act]. Defendant Rubashkin faces the possibility of up to five
> years in jail for a payment allegedly made one day late.
> Assuming . . . Defendant Rubashkin is convicted of [Counts
> 144 through 163], he could face up to 100 years in prison.
> This is a rare case where a threshold comparison of the crime
> committed and the sentence imposed leads to an inference of
> gross disproportionality.

*Id.* at 5 (citing *United States v. Nagel*, 559 F.3d 756, 762-63 (8th Cir. 2009)).

### D.  Surreply

In surreply, the government reiterates that § 195 is not void for vagueness as applied to Defendants Agriprocessors and Rubashkin. The government stresses that § 195 does not lend itself to arbitrary enforcement. Although the government concedes there is not a mechanism within the Packers' Act to refer cases for criminal prosecution under § 195, "the statute . . . is unique in that there is a target-specific step which must occur prior to the attachment of any criminal liability," *i.e.*, a cease-and-desist order from the Secretary. Surreply at 3. In a footnote, the government invites the court to judicially construe § 195 to include a *mens rea* requirement if the court deems it necessary to save the statute from constitutional attack.

## VI.  OVERVIEW OF THE PACKERS' ACT

### A.  Context

The Packers' Act "is one of the most comprehensive regulatory measures ever enacted." Christopher R. Kelley, *An Overview of the Packers & Stockyards Act*, Ark. L. Notes 35 (2003) ("Kelley Article") (citation and internal quotation omitted). "In broadly

---

[8](...continued)
and cited *United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002).

prohibiting monopolistic, unfair, deceptive, and unjustly discriminatory practices, the [Packers'] Act gives the [Secretary] complete inquisitorial, visitorial, supervisory, and regulatory power over the packers, stockyards, and all activities connected therewith." *Id.* (internal quotations omitted).

To understand the Packers' Act, one must "know the conditions under which Congress acted" in the early part of the Twentieth Century. *Stafford v. Wallace*, 258 U.S. 495, 513 (1922).

> The [Packers' Act] has a long legislative history which began with realization of the tremendous potential power of the five great packing companies of that day to control both the prices of livestock and the price to consumers of meat products. The stockyards and slaughtering centers, controlled by a handful of interests, were a bottleneck through which the livestock had to move on the way to the ultimate consumer, and those in control at the bottleneck were in position to misuse power to the detriment both of the producer and of the consumer.

*Crosse & Blackwell Co. v. FTC*, 262 F.2d 600, 604 (4th Cir. 1959); *see also* FTC, Report of the FTC on the Meat Packing Industry (July 3, 1919) (discussing the anti-competitive, monopolistic practices of the "Big Five" meatpackers, Swift, Armour, Morris, Cudahy and Wilson, and recommending governmental ownership of the stockyards).

"The chief evil feared [was] the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." *Stafford*, 258 U.S. at 514-15; *see also Mahon v. Stowers*, 416 U.S. 100, 106 (1974) (reiterating that "the 'chief evil' at which [the Packers' Act] was aimed was the monopoly of the packers"). "Congress thought that the power to maintain this monopoly was aided by control of the stockyards." *Stafford*, 258 U.S. at 515. "Expenses incurred in the passage through the stockyards necessarily reduce the price received by the shipper, and increase the price to be paid by the consumer." *Id.*

Congress sought "to assure fair trade practices in the livestock marketing and meat-

18

packing industry in order to safeguard farmers and ranchers." *Bruhn's Freezer Meats of Chi., Inc. v. U.S. Dept. of Agric.*, 438 F.2d 1332, 1337 (8th Cir. 1971). Congress recognized a need "to protect the immediate financial interests of livestock . . . producers by, among other things, ensuring that they are paid promptly based on accurate animal weights." Kelley Article at 36 (footnotes omitted).

> No individual is engaged in a riskier endeavor or one more vital to the national interest than the producer. And no entrepreneur is so completely at the mercy of the marketplace. The livestock producer, if he successfully combats the vicissitudes of weather, financing, and skyrocketing costs, must sell when his cattle are ready irrespective of the market. His livestock may represent his entire year's output. If he is not paid, he faces ruin. The meat packing industry is, of course, an integral part of our Nation's agricultural marketing system. What is needed . . . is legislation that will afford a measure of protection to the livestock producer and feeder and yet not be so restrictive as to reduce competition in the livestock slaughter business.

S. REP. 94-932, 1976 at *5-*6. Congress also sought to secure

> the free and unburdened flow of live stock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers on the borders of that region, and thence in the form of meat products, to the consuming cities of the country in the Middle West and East, or, still as live stock, to the feeding places and fattening farms in the Middle West or East for further preparation for the market.
>
> * * *
>
> The act . . . treats the various stockyards of the country as great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East.

*Stafford*, 258 U.S. at 514-16.

When viewed in historical context, then, the Packers' Act "is remedial legislation

and must be liberally construed in order to further its life and fully effectuate its public purpose to prevent economic harm to producers and consumers at the expense of middlemen." *Glover Livestock Comm'n Co. v. Hardin*, 454 F.2d 109, 111 (8th Cir. 1972), *rev'd on other grounds sub. nom. Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182 (1973). "The Act was framed in language designed to permit the fullest control of packers and stockyards which the Constitution permits." *Bruhn's Freezer Meats of Chi., Inc.*, 438 F.2d at 1340.

### B. Nuts & Bolts

The Packers' Act regulates "the business of the packers done in interstate commerce." *Stafford*, 258 U.S. at 513. The Packers' Act defines "packers" broadly to include

> any person engaged in the business (a) of buying livestock in commerce for purposes of slaughter, or (b) of manufacturing or preparing meats or meat food products for sale or shipment in commerce, or (c) of marketing meats, meat food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce.

7 U.S.C § 191.

The Packers' Act provides cattle suppliers with many protections vis-a-vis packers. Generally, the Packers' Act

> forbids [packers] to engage in unfair, discriminatory, or deceptive practices in such commerce, or to subject any person to unreasonable prejudice therein, or to do any of a number of acts to control prices or establish a monopoly in the business.

*Stafford*, 258 U.S. at 513.

The specific protection at issue in the case at bar is 7 U.S.C. § 228b. Section 228b seeks to ensure that packers pay cattle suppliers on time. In relevant part, § 228b provides:

> Each packer . . . purchasing livestock shall, before the close

20

of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized representative the full amount of the purchase price: *Provided*, That each packer . . . purchasing livestock for slaughter shall, before the close of the next business day following purchase of livestock and transfer of possession thereof, actually deliver at the point of transfer of possession to the seller or his duly authorized representative a check or shall wire transfer funds to the seller's account for the full amount of the purchase price; or, in the case of a purchase on a carcass or "grade and yield" basis, the purchaser shall make payment by check at the point of transfer of possession or shall wire transfer funds to the seller's account for the full amount of the purchase price not later than the close of the first business day following determination of the purchase price: *Provided further*, That if the seller or his duly authorized representative is not present to receive payment at the point of transfer of possession, as herein provided, the packer . . . shall wire transfer funds or place a check in the United States mail for the full amount of the purchase price, properly addressed to the seller, within the time limits specified in this subsection, such action being deemed compliance with the requirement for prompt payment.

7 U.S.C. § 228b(a) (emphases added).[9] Section 228b recognizes that "[t]imely payment in a livestock purchase prevents the seller from being forced, in effect, to finance the transaction." *Van Wyk v. Bergland*, 570 F.2d 701, 704 (8th Cir. 1978) (analyzing 9 C.F.R. § 201.43(b)). "By insuring that the seller will receive the fair market value of his livestock, undiminished by the cost of financing the sale, the requirement that a purchaser make timely payment fulfills the purpose of the Act." *Id.*

The Packers' Act deems a failure to comply with § 228b to constitute an "unlawful practice." *See* 7 U.S.C. § 228b(c) ("Any delay or attempt to delay . . . the collection of

---

[9] Next-day payment is not required if the parties "expressly agree in writing" before the purchase to some other schedule. *Id.* § 228b(b).

funds as herein provided . . . shall be considered an 'unfair practice' in violation of this chapter."); *id.* § 192 (defining "unlawful practices" to include "any unfair . . . practice"). Unlawful practices trigger the detailed administrative enforcement scheme set forth in 7 U.S.C. § 193,[10] which "constitutes the Secretary of Agriculture a tribunal to hear

---

[10] In relevant part, § 193 provides:

> Whenever the Secretary has reason to believe that any packer . . . has violated or is violating any provision of this subchapter, he shall cause a complaint in writing to be served upon the packer . . . , stating his charges in that respect, and requiring the packer . . . to attend and testify at a hearing at a time and place designated therein, at least thirty days after the service of such complaint; and at such time and place there shall be afforded the packer . . . a reasonable opportunity to be informed as to the evidence introduced against him (including the right of cross-examination), and to be heard in person or by counsel and through witnesses, under such regulations as the Secretary may prescribe.
>
> * * *
>
> If . . . the Secretary finds that the packer . . . has violated or is violating any provisions of this subchapter covered by the charges, he shall make a report in writing in which he shall state his findings as to the facts, and shall issue and cause to be served on the packer or swine contractor an order requiring such packer or swine contractor to cease and desist from continuing such violation. . . . . The Secretary may also assess a civil penalty of not more than $10,000 for each such violation. In determining the amount of the civil penalty to be assessed under this section, the Secretary shall consider the gravity of the offense, the size of the business involved, and the effect of the penalty on the person's ability to continue in business. If, after the lapse of the period allowed for appeal or after the affirmance of such penalty, the person against whom the civil penalty is assessed fails to pay such penalty, the Secretary may refer the matter to the Attorney General who

(continued...)

complaints and make findings thereon, and to order the packers to cease any forbidden practice." *Stafford*, 258 U.S. at 513. "An appeal is given to the Circuit Court of Appeals from these findings and orders." *Id.* "They are to be enforced by the District Court by penalty if not appealed from and if disobeyed." *Id.*

Failure to obey a valid cease-and-desist order may subject the packer to criminal sanction. Section 195 is the behavior modification tool of last resort in the Packers' Act. It is "clearly criminal" in nature. *United States v. J.B. Williams Co.*, 498 F.2d 414, 448 (2d Cir. 1974). Section 195 provides:

> Any packer . . . or any officer, director, agent, or employee of a packer . . . , who fails to obey any order of the Secretary issued under the provisions of section 193 of this title . . . —
>
> (1) After the expiration of the time allowed for filing a petition in the court of appeals to set aside or modify such order, if no such petition has been filed within such time; or
>
> (2) After the expiration of the time allowed for applying for a writ of certiorari, if such order, or such order as modified, has been sustained by the court of appeals and no such writ has been applied for within such time; or
>
> (3) After such order, or such order as modified, has been sustained by the courts as provided in section 194 of this title; shall on conviction be fined not less than $500 nor more than $10,000, or imprisoned for not less than six months nor more than five years, or both. Each day during which such failure continues shall be deemed a separate offense.

---

[10](...continued)
> may recover such penalty by an action in the appropriate district court of the United States.

7 U.S.C. § 193(a), (b).

7 U.S.C. § 195 (emphasis omitted).

## VII.  FIFTH AMENDMENT ANALYSIS

### A.  Facial Challenge

Defendants Agriprocessors and Rubashkin argue that § 195 is void-for-vagueness as to hypothetical third persons, such as some of Defendant Agriprocessors' accountants. The court holds Defendants Agriprocessors and Rubashkin lack standing to press this argument.

Ordinarily "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *United States v. Raines*, 362 U.S. 17, 21 (1960).  "[W]hen possible, [a court] must narrowly read a statute to be constitutional as applied to the facts of the case before [it] and cannot consider other arguably unconstitutional applications of that statute." *United States v. Lemons*, 697 F.2d 832, 835 (8th Cir. 1983).  "The rule is . . . an expression of judicial self-restraint apart from the 'case-or-controversy' requirement in Article III of the federal Constitution which is the basis of much standing doctrine." *Id.* (citing *Eisenstadt v. Baird*, 405 U.S. 438, 443-44 (1972)).  Put simply, a person "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 495 (1982); *see also Garner v. White*, 726 F.2d 1247, 1277 (8th Cir. 1984).

The Supreme Court has recognized specific exceptions to this standing doctrine, for example,

> when an aggrieved third person could not properly raise an issue on her or his behalf, when the statute itself has an inhibitory effect on freedom of speech, when a limiting construction of a criminal statute would make the statute unconstitutionally vague, when a state court has pronounced that the statute is constitutional in all its applications, or in the

> rare case when a court can determine that the legislature would not want the statute to stand unless it could stand in all its applications.

*Lemons*, 697 F.2d at 835 (citing *Raines*, 362 U.S. at 22-23) referring to the second exception as "overbreadth"); *see, e.g.*, *United States v. Washam*, 312 F.3d 926, 929 (8th Cir. 2002) ("'[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.'" (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)). Defendants Agriprocessors and Rubashkin do not squarely argue that any of these exceptions apply in this case, and thus the court holds that no such exceptions apply.[11]

Defendant *may* assert a true facial vagueness challenge—that the "enactment is impermissibly vague in all of its applications." *Flipside*, 455 U.S. at 494-95. Because the court must "'examine the [defendant's] conduct before analyzing other hypothetical applications of the law,'" *Woodis v Westark Comm. Coll.*, 160 F.3d 435, 438 (8th Cir. 1998) (quoting *Flipside*, 455 U.S. at 495), however, the court need only judge the statute as applied to Defendant, *Morales*, 527 U.S. at 78 n.1 (Scalia, J., dissenting) ("[A] facial attack, since it requires unconstitutionality in all circumstances, necessarily presumes that the litigant presently before the court would be able to sustain an as-applied challenge.").

---

[11] For example, (it cannot be said that § 195 cannot be said) to reach a substantial amount of constitutionally protected conduct. Failure to make timely payment in violation of an order from the Secretary does not implicate First Amendment rights or concerns about any "chilling" effect the statute may have on the exercise of the constitutional rights of others. In any event, failing to obey a cease-and-desist order is a commercial activity no matter who fails to do so; "[t]he overbreadth doctrine does not apply to commercial speech." *Flipside*, 455 U.S. at 496; *see, e.g.*, *Garner*, 726 F.2d at 1277 ("The overbreadth doctrine is inapplicable to commercial speech—speech which does no more than propose a commercial transaction") (internal quotations omitted). Likewise, the parties have not presented the court with reason to believe other employees could not challenge the statute's constitutionality themselves if the statute caused them injury.

## B. As Applied Challenge

"The Fifth Amendment guarantees every citizen the right to due process. Stemming from this guarantee is the concept that vague statutes are void." *Washam*, 312 F.3d at 929 (citing *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). "An overly vague statute 'violates the first essential of due process of law,' because citizens 'must necessarily guess at its meaning and differ as to its application.'" *United States v. Bamberg*, 478 F.3d 934, 937 (8th Cir. 2007) (quoting *Connally*, 269 U.S. at 391). "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Washam*, 312 F.3d at 929 (internal quotations omitted). "'Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'" *Id.* (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32-33 (1963)).

"The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Flipside*, 455 U.S. at 498. "Laws regulating business behavior are held to a lesser standard of definiteness because businesses 'can be expected to consult relevant legislation in advance of action.'" *Garner*, 726 F.2d at 1278 (quoting *Flipside*, 455 U.S. at 498). However, criminal statutes require greater specificity than laws carrying mere civil penalties because criminal penalties are more severe. *Flipside*, 455 U.S. at 498-9; *see also Garner*, 726 F.2d at 1278. Because § 195 regulates business activity but also carries felonious penalties, the court applies the same "stricter test of specificity" that the Eighth Circuit Court of Appeals applied in *Garner* to a law with similarly weighty penalties. *Garner*, 726 F.2d at 1278. Even under this stricter standard, "regardless of the severity of a law's criminal sanctions, a law regulating business behavior which does not restrict constitutionally protected conduct is not void for vagueness if it is sufficiently clear as applied to the conduct of the complaining party." *Id.*

"There is a two-part test to determine whether a statute is void for vagueness. The statute, first, must provide adequate notice of the proscribed conduct, and, second not lend itself to arbitrary enforcement." *Bamberg*, 478 F.3d at 937 (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)); *Washam*, 312 F.3d at 929 (8th Cir. 2002). The court considers each part of this test, in turn.

### 1.     *Fair notice*

First, the court considers whether § 195 provided fair notice to Defendants Agriprocessors and Rubashkin. "A penal statute is void if it does not sufficiently define a criminal offense so that ordinary people can understand what conduct is prohibited." *Washam* 312 F.3d at 929-30 (citing *Kolender*, 461 U.S. at 357); *see also Garner*, 726 F.2d at 1277 ("Vague laws may trap the innocent by not providing fair warning.").

On the facts presently before the court, the court does not agree that § 195's plain language failed to provide an ordinary person in the situation of Defendants Agriprocessors and Rubashkin with sufficient notice that noncompliance with the Order would trigger criminal penalties. The Order clearly and concisely commanded Defendant Agriprocessors to "cease and desist" its violations of § 228b, *i.e.*, "[f]ailing to pay, when due, the full purchase price of livestock" and "[f]ailing to deposit checks issued in payment for livestock in the mail before the close of the next business day after the purchase of such livestock." Gov. Ex. 1 at 2.

Assuming all the government's evidence is true, Defendants Agriprocessors and Rubashkin certainly knew about the Order and their obligations under the Packers' Act. Defendant Rubashkin signed the Order on behalf of Defendant Agriprocessors. Defendant Rubashkin also swore to his obligations under the Packers' Act in the Affidavit, and these obligations are also referenced in the Agreement. An ordinary person in the position of Defendant Agriprocessors or Rubashkin would understand that failing to comply with § 228b in the future would violate criminal law. An ordinary person would also find that

§ 195 clearly explains the actions it prohibits and the consequences of violations, thus providing sufficient instruction for how a person in the situation of Defendant Agriprocessors and Rubashkin might conform their conduct to the Packers' Act's requirements. Indeed, the Eighth Circuit Court of Appeals recently noted that it looked favorably upon an argument that "actual notice" that one's conduct was illegal precludes a party from claiming that a statute is void for vagueness as applied to him. *Washam*, 312 F.3d at 930. Here, the government alleges something more, *i.e.*, Defendants Agriprocessors and Rubashkin willfully violated the Order.[12] The Order does not have

---

[12] Section 195's lack of a *mens rea* element might run afoul of the Due Process Clause if the government attempted to hold other employees of Defendant Agriprocessors strictly liable for the failures of Defendant Agriprocessors and Rubashkin to comply with the Order. Defendants Agriprocesors and Rubashkin, however, lack standing to press this argument. In any event, the court has the power to read a *mens rea* element into a statute in keeping with common law canons of statutory construction. *See, e.g.*, *Staples v. United States*, 511 U.S. 600, 605 (1994). "A *mens rea* element may mitigate vagueness by insuring that those acting in good faith are not swept within a law's broad or ambiguous language." *Garner*, 726 F.2d at 1278. "The omission of subjective scienter language from a statute does not preclude a court from reading such a knowledge requirement into the statute." *United States v. Posters 'n Things*, 969 F.2d 652, 657 (8th Cir. 1992) (citing *Morisette v. United States*, 342 U.S. 246, 250 (1952) (reading a requirement of criminal intent into a statute carrying a penalty of up to a $10,000 fine and/or ten years imprisonment for conversion of government property worth more than $100)). In fact, "so long as there is no 'indication of contrary purpose in the language or legislative history of [a] statute,' a court can read a *mens rea* into a statute." *Id.* (quoting *Liparota v. United States,* 471 U.S. 419, 425, (1985) (holding that a statute carrying penalties of up to $10,000 in fines and up to five years imprisonment for food stamp fraud for values over $100 required a *mens rea* of knowledge for all elements)).

The Packers' Act is at its core an antitrust measure. Antitrust crimes are generally not construed as strict liability crimes. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438-443 (1978) (listing several reasons why criminal offenses under the Sherman Antitrust Act require intent, even if no *mens rea* element is explicitly stated). Additionally, section 195's serious criminal penalties themselves strongly suggest that Congress intended a *mens rea* requirement. *Staples*, 511 U.S. at 618 ("[W]here . . . dispensing with *mens rea* would

(continued…)

a sunset provision, and Defendants Agriprocessors and Rubashkin cite no authority for their conclusion that the Order may not survive six years without giving them fair notice and offending due process.

### 2. *Susceptibility to arbitrary enforcement*

Second, the court examines whether § 195 is susceptible to arbitrary enforcement. In this inquiry, the court asks whether the language of § 195 is so vague that it makes it susceptible to arbitrary enforcement. Section 195 "must provide standards that are clear enough that those charged with applying the statute are not required to make basic policy decisions on a subjective or arbitrary basis." *Fogie v. THORN Ams., Inc.*, 95 F.3d 645, 650 (8th Cir. 1996) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-9 (1972)); *see also Garner*, 726 F.2d at 1277 ("'A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis'" (quoting *Grayned*, 408 U.S. at 108-9)); *Washam*, 312 F.3d at 931 ("Congress must provide minimal requirements to guide law enforcement in order to prevent police officers, prosecutors, and juries from pursuing their 'personal predilections'" (quoting *Kolender*, 461 U.S. at 358)). For example, courts have found statutes lend themselves to arbitrary enforcement where the statutes grant police the discretion to define when a person is "remain[ing] in any one place with no apparent purpose," *Morales*, 527 U.S. at 61, what forms of personal identification a person must provide to meet a requirement of producing

---

[12](...continued)
require the defendant to have knowledge only of traditionally lawful conduct, a severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a *mens rea* requirement.").

Thus, the court resorts to the "usual presumption that a defendant must know the facts that make his conduct illegal." *Id.* at 619. A party "must have had knowledge of the facts, though not necessarily the law," that make an otherwise innocent act illegal. *Morisette*, 342 U.S. at 271; *see also U.S. Gypsum Co.*, 438 U.S. at 446 (finding "knowledge of the anticipated consequences" as the proper *mens rea* for criminal violations stemming from business behavior).

"credible and reliable" identification, *Kolender*, 461 U.S. at 358, and what constitutes conduct on public sidewalks that is "in a manner annoying to persons passing by," *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).

The court holds § 195 does not impermissibly lend itself to arbitrary enforcement. Section 195 subjects those who "fail[] to obey any order of the Secretary" to punishment. 7 U.S.C. § 195. The Order itself states that "Agriprocessors, Inc., its agents and employees . . . shall cease and desist" their violations of section 228b and describes those violations in detail: "[f]ailing to pay, when due, the full purchase price of livestock" and "[f]ailing to deposit checks issued in payment for livestock in the mail before the close of the next business day after the purchase of such livestock." Gov. Ex. 1 at 2. The violations described in the Order are consistent with the plain language of § 228b. Nothing in § 195, § 228b or the Order gave prosecutors latitude to interpret what a violation of § 195 might be as applied to Defendants Agriprocessors and Rubashkin. Though a referral mechanism may have made § 195 less vulnerable to arbitrary enforcement, Defendant cites no law, nor can the court find any, suggesting that a statute must have such a provision to not be vague.

Defendants Agriprocessors and Rubashkin insist § 195 must lend itself to arbitrary enforcement because the government apparently concedes it has never criminally prosecuted anyone under § 195 in the 88-year history of the Packers' Act. Though surveying the number and types of situations in which a statute has been applied may be useful in showing a statute is not susceptible to arbitrary enforcement, *see, e.g., United States v. Birbragher*, 576 F.Supp.2d 1000, 1013-14 (N.D. Iowa 2008), the frequency of prosecutions under a statute is not the key criterion of arbitrary enforcement. Indeed, the cases generally do not discuss how often the law in question is enforced. *See, e.g.*, *Washam*, 312 F.3d 926; *Woodis*, 160 F.3d 435.

### C. Defense of Desuetude

Nonetheless, the government's apparent concession that this case is the first § 195 prosecution in the 88-year history of the Packers' Act raises a related due process concern: the defense of desuetude. Though not explicitly raised in the parties' briefs, Defendant's argument that an indictment under § 195 is void for vagueness due to its susceptibility to arbitrary enforcement because it has apparently never been used before is very similar to the due process defense of desuetude. Therefore, the court will examine the merits of a potential desuetude defense based on the record before it.

"Desuetude is a civil law doctrine rendering a statute abrogated by reason of its long and continued non-use." *United States v. Elliott*, 266 F. Supp. 318, 325 (S.D.N.Y. 1967). "It is not a part of English jurisprudence, although it is recognized in the law of Scotland." *Id.* (citing Arthur Bonfield, *The Abrogation of Penal Statutes by Nonenforcement*, 41 Iowa L. Rev. 389, 395-409 (1964)). Commentators and courts are divided as to its status under American law, and the Supreme Court has not squarely addressed the question. *See, e.g.*, *Poe v. Ullman*, 367 U.S. at 501 ("The undeviating policy of nullification by Connecticut of its anti-contraceptive laws throughout all the long years that they have been on the statute books bespeaks more than prosecutorial paralysis. . . . 'Deeply embedded traditional ways of carrying out state policy . . . —or not carrying it out—are often tougher and truer law than the dead words of a written text.'") (quoting *Nashville, C & St. L. Ry. v. Browning*, 310 U.S. 362, 369 (1940)).

The courts that recognize the defense of desuetude adhere to the view that the persistent non-use of a statute might implicate the Due Process Clause, because "[i]n some situations a desuetudinal statute could prevent serious problems of fair notice." *Elliott*, 266 F. Supp. at 326. Those courts that accept the defense of desuetude usually require proof of three elements. *See, e.g.*, *Comm. on the Legal Ethics of the W. Va. State Bar v. Printz*, 416 S.E.2d 720, 726-27 (W.Va. 1992) (referring to three "factors," but requiring

all three factors to be present). Absent proof of all three elements, the court must adhere to the view, "'The law hath not been dead, though it hath slept.'" *Elliott*, 266 F. Supp. at 326 (quoting Shakespeare, *Measure for Measure*, Act II, Scene ii).

First, the court must consider whether the crime at issue is *malum in se* or *malum prohibitum*. *Printz*, 416 S.E.2d at 726. "Crimes that are *malum in se* will not lose their criminal character through desuetude, but crimes that are *malum prohibitum* may." *Id.*

> For instance, if no one had been prosecuted under an obscure statute prohibiting ax murders since Lizzie Borden was acquitted, we would still allow prosecution under that statute today. Even though no one has been prosecuted for an ax murder in 50 years, we all still understand that it is inappropriate to resort to garden tools to settle family quarrels. On the other hand, we might think it quite reasonable to approach the man who has embezzled the money that we have set aside for our children's education and offer not to prosecute him if he will return the money to us.

*Id.*; *see, e.g.*, *Elliott*, 266 F. Supp. at 326 (holding that defendant's crime of conspiring to destroy a bridge was *malum in se* and thus the defense of desuetude was not available to him and distinguishing obsolete criminal statutes such as "a law forbidding the sale of candy cigarettes, or prohibiting kite flying, or banning the exhibition of films depicting a felony").[13] Because the government does not dispute the contention of Defendants Agriprocessors and Rubashkin that § 195 is *malum prohibitum* and not *malum in se*, Defendants Agriprocessors and Rubashkin meet this first element.

Second, "there must be an open, notorious, and pervasive violation of the statute for a long period before desuetude will take hold." *Printz*, 416 S.E.2d at 726. Here any challenge by Defendants Agriprocessors and Rubashkin fails, because they have not endeavored to provide the court with evidence on this point. Although it is apparently

---

[13] Sections 195 and 228b are not obsolete. These provisions of the Packers' Act are as important today as they were in 1921.

undisputed that the government has never prosecuted anyone in 88 years for a violation of § 195, the court has no way to know whether, over such timespan, others have engaged in the open, notorious and pervasive violations of the Secretary's Orders. Were Defendants Agriprocessors or Rubashkin to present the court with compelling evidence to show that the government persistently failed to initiate criminal prosecutions notwithstanding almost a century's worth of open, notorious and pervasive violations of the Secretary's Orders, the court's conclusion might be much different. For all the court knows, it is equally likely that a seemingly unlikely fact is true: the facts of the instant case are singular.

Third, Defendants Agriprocessors and Rubashkin must show "a conspicuous policy of nonenforcement," [*i.e.*,] '[an] undeviating policy of nullification . . . throughout all the long years . . . . [that] bespeaks more than prosecutorial paralysis.'" *Id.* (quoting *Poe*, 367 U.S. at 501. Again, the government has never prosecuted anyone in 88 years for a violation of § 195. While this proves lack of prosecution, it does not necessarily show a conspicuous policy of *nonenforcement*. Nonenforcement presumes open and notorious violations. To this extent, this third factor dovetails with the second factor.[14]

---

[14] Nor have Defendants Agriprocessors and Rubashkin shown the government has violated the the Fifth Amendment's Due Process Clause's guarantee against selective or discriminatory prosecution under federal laws. *Wayte v. United States*, 470 U.S. 598, 610 n.9 (1985). "[A] prosecutor may exercise discretion in deciding who should be prosecuted as long as he does not deliberately discriminate between persons in similar circumstances based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v Alarik*, 439 F.2d 1349, 1350-51 (8th Cir. 1971) (citing *Oyler v. Boles, Warden*, 368 U.S. 448, 456 (1962)). "A person claiming unequal enforcement of a facially neutral statute must show both that the enforcement had a discriminatory effect, and that the enforcement was motivated by a discriminatory purpose." *United States v. Bell*, 86 F.3d at 823 (citing *United States v. Armstrong*, 517 U.S. 456, ---- (1996)).

A criminal defendant bears the burden of overcoming the presumption that he was

(continued...)

### D.  Conclusion

For all of the foregoing reasons, the court rejects the Fifth Amendment challenges of Defendants Agriprocessors and Rubashkin to Counts 144 through 163 of the Seventh Superseding Indictment.

## VIII.  EIGHTH AMENDMENT ANALYSIS

The court holds that the Eighth Amendment arguments of Defendants Agriprocessors and Rubashkin are not ripe for this court's review.  Defendants Agriprocessors and Rubashkin are presumed to be innocent, and it would be premature for the court to rule as to the constitutionality of a possible sentence before trial.  *See, e.g.,*

---

[14](...continued)
prosecuted non-discriminatorily and must show not only that others similarly situated were not prosecuted for the same acts but also that his or her prosecution "was in bad faith and based upon impermissible considerations."  *United States v. Crow Dog*, 532 F.2d 1182, 1196 (8th Cir. 1976).  "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary."  *Armstrong*, 517 U.S. at 466 (quotation omitted).  The only evidence Defendant puts forward to show that prosecutors enforced section 195 arbitrarily against him, let alone with a discriminatory effect or purpose, is that it appears that no corporate or individual defendant has been prosecuted under section 195 before.  Def.'s Br. (docket no. 439) at 7; Def.'s Rep. (docket no. 453) at 4.

The Eighth Circuit Court of Appeals addressed a similar factual situation in *Williams v. Brewer*, 442 F.2d 657, 658 (8th Cir. 1971).  Though section 195 has been in force far longer than the six-year-old law that the challenger in *Williams* claimed had been discriminatorily enforced against him, the two cases are similar in that prosecutors had never indicted anyone under the criminal statute at issue in *Williams*, either.  *Id.*  The Eighth Circuit Court of Appeals rejected the petitioner's argument that he had been "singled out for punishment while others similarly situated [had] violated the law with impunity" because neither the petitioner's arguments nor the record contained any evidence supporting the contention.  *Id.*  Thus, merely showing that a statute has never been enforced before is not sufficient evidence to meet the very high evidentiary burden to show discriminatory enforcement.  Defendant provides the court with no more evidence that prosecutors "singled out" Defendant than the petitioner in *Williams* did, so based on the evidence the court has before it, the court must reject the selective or discriminatory enforcement argument as well.

*United States v. Torres*, 683 F. Supp. 56, 61-62 (S.D.N.Y. 1988) ("In the present posture of this case, defendants' Eighth Amendment claim does not present a case or controversy. It is unclear whether defendants will ever be faced with sentencing . . . ."); *see also United States v. Williams*, 128 F.3d 1239, 1242 (8th Cir. 1997) (holding that a defendant's claim that a restitution statute might violate his Eight Amendment right against being punished merely for his poverty was not ripe because the defendant "does not assert he has suffered or is about to suffer this punishment"). *But see United States v. Smith*, 713 F. Supp. 1315 (D. Minn. 1989) (reaching opposite conclusion). The reliance of Defendants Agriprocessors and Rubashkin on *United States v. Quinones*, 313 F.3d 49, 58-59 (2d. Cir. 2002), is misplaced. Because neither Defendant Agriprocessors nor Defendant Rubashkin faces the death penalty, the Second Circuit Court of Appeals' discussion of the "substantial hardship" death penalty defendants face prior to trial is irrelevant here.

Accordingly, the court rejects the Eighth Amendment challenges of Defendants Agriprocessors and Rubashkin to Counts 144 through 163 of the Seventh Superseding Indictment.

## IX.  DISPOSITION

In light of the foregoing, the Motion (docket no. 439) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 27th day of July, 2009.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA